FREDERICK MERRIAM & others[1] vs. SECRETARY OF THE
COMMONWEALTH.

Suffolk. December 9, 1977. — May 16, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, & ABRAMS, JJ.

*Constitutional Law*, Apportionment of representation, Representative
districts. *Municipal Corporations*, Representative districts.

Scope of judicial review of legislative acts. [253-257]
Discussion of the meaning of the words "as nearly as may be" as appearing
in various Amendments to the Constitution of the Commonwealth
dealing with the establishment of representative districts. [257-261]
Statute 1977, c. 277, does not violate the provisions of art. 101 of the
Amendments to the Constitution of the Commonwealth in so far as it
establishes the Twelfth and Thirteenth Essex representative districts,
each of which consists of a portion of the town of Danvers and of the
city of Peabody. [261-264] WILKINS, J., dissenting.

CIVIL ACTION commenced in the Supreme Judicial Court
on July 19, 1977.

Following transfer to the county court, the case was re-
ported without decision by *Kaplan, J.*

*Walter H. Mayo, III (Robert E. Cowden, III*, with him)
for the plaintiffs.

---

[1] The other plaintiffs are Baron Mayer, Thomas Kerans, Kenneth
Bellevue, John Sears, and Robert Curtis. All are residents and registered
voters of the town of Danvers. Merriam, Mayer, Kerans, Bellevue and
Sears are described as members of the town's board of selectmen, and
Curtis as the town manager. The complaint alleges that the "[p]laintiffs
bring this action both individually and in their official capacities as repre-
sentatives of the registered voters of the Town of Danvers." Since each
plaintiff is a registered voter of the town, the complaint qualifies as "the
petition of any voter of the Commonwealth," within the meaning of those
words as used in art. 101, § 3. We need not consider whether the plaintiffs
may also bring this action "as representatives of the registered voters of
the Town of Danvers," as they purport to do.

*Terence P. O'Malley*, Assistant Attorney General (*Louis A. Rizoli*, Assistant Attorney General, with him) for the defendant.

QUIRICO, J. By art. 101, § 1, of the Amendments to the Constitution of the Commonwealth, approved by the people on November 5, 1974, the Legislature was required to divide the Commonwealth into 160 representative districts. Section 3 of art. 101 vests jurisdiction in the Supreme Judicial Court, "upon the petition of any voter of the Commonwealth, . . . for judicial relief relative to the establishment of House of Representatives . . . districts."

By G. L. c. 57, § 4, as appearing in St. 1977, c. 277, § 1, the Legislature divided the Commonwealth into 160 representative districts, and by § 2 provided that "[t]he supreme judicial court shall have jurisdiction of any petition for a writ of mandamus relative to the establishment of . . . [the] representative districts under section one of this act."

The plaintiffs started this action by a complaint seeking relief in the nature of mandamus.[2] They allege that St. 1977, c. 277, § 1, in so far as it purports to establish the Twelfth and Thirteenth Essex representative districts (Twelfth and Thirteenth districts), each of which consists of a portion of the town of Danvers and of the city of Peabody, violates art. 101 of the Amendments to the Constitution of this Commonwealth.[3] They seek a judgment (a) declaring

---

[2] This is in accord with current practice as established by the Massachusetts Rules of Civil Procedure, 365 Mass. 730 (1974). Rule 2, *supra* at 733, provides: "There shall be one form of action to be known as 'civil action.'" Rule 81 (b), *supra* at 841, provides: "The following writs are abolished: . . . mandamus . . . . In any action seeking relief formerly obtainable under any such writ, procedure shall follow these rules." General Laws c. 249, § 5, as appearing in St. 1973, c. 1114, § 291, provides: "A civil action to obtain relief formerly available by writ of mandamus may be brought in the supreme judicial or superior court."

[3] Although the complaint alleges that "St. 1977, c. 277 denies to the plaintiffs the equal protection of the laws, as guaranteed by Part 1, Articles I and IX of the Constitution of the Commonwealth and the Fifth and Fourteenth Amendments to the Constitution of the United States, in that the statute cancels out the voting strength of the plaintiffs in, and denies access by the plaintiffs to, the General Court," there are no references to those constitutional provisions in the plaintiffs' brief.

that c. 277 is unconstitutional as it applies to the two representative districts in question, and (b) "restraining the defendant from taking any steps to prepare or process nomination papers or to prepare election ballots for the 1978 election to the General Court utilizing the representative districts established by St. 1977, c. 277."

For the reasons discussed below, we hold that St. 1977, c. 277, in so far as it establishes the Twelfth and Thirteenth districts, does not violate art. 101 of the Amendments to the Constitution of this Commonwealth, and we deny the injunctive relief sought by the plaintiffs.

Article 101 reduces the number of members of the House of Representatives from the present 240 to 160. It further requires that this division of the Commonwealth by the Legislature shall result in "one hundred and sixty representative districts [1] of contiguous territory [2] so that each representative will represent an equal number of inhabitants, *as nearly as may be*; [3] and such districts shall be formed, *as nearly as may be*, without uniting two counties or parts of two or more counties, two towns or parts of two or more towns, two cities or parts of two or more cities, or a city and a town, or parts of cities and towns, into one district [; and 4, s]uch districts shall also be so formed that no town containing less than twenty-five hundred inhabitants . . . shall be divided" (emphasis supplied). Art. 101, § 1.

Each of the proposed Twelfth and Thirteenth districts is made up of "contiguous territory," thus complying with the first of the four requirements of art. 101. The Twelfth district includes 36,713 inhabitants, and the Thirteenth includes 33,797 inhabitants, and no argument is made that such totals do not satisfy the second requirement that each district shall include "an equal number of inhabitants, as nearly as may be." [4] Passing over the third requirement of

---

[4] The "redistricting norm," sometimes also referred to as the "ideal number of inhabitants per representative," was 36,184. That figure was arrived at by dividing the total number of inhabitants of the Commonwealth as shown by the 1975 State census by 160 (5,789,478 divided by 160 equals 36,184). 1977 House Doc. No. 5900, at 110.

art. 101 for the moment, we note that the fourth require-
ment, prohibiting the division of towns with less than 2,500
inhabitants, is not involved in the two representative dis-
tricts in question, since Danvers, the only town within the
two districts in question, had 24,947 inhabitants.

We thus come to the basic issue presented to us, whether
the division which placed a part of Danvers and a part of
Peabody in each of the Twelfth and Thirteenth districts
violates that part of art. 101, § 1, that required the Legisla-
ture to divide the Commonwealth into 160 representative
districts "*as nearly as may be,* without uniting . . . parts of
cities and towns, into one district" (emphasis supplied).
That issue is before us on a statement of agreed facts which
incorporated 1977 House Doc. No. 5900, the report of the
Joint Special Committee (committee) which recommended
the division of the Commonwealth into the 160 representa-
tive districts that were established by St. 1977, c. 277.[5] We
summarize the statement of agreed facts as they relate to the
issue before us.

Two of the districts proposed by St. 1977, c. 277, § 1,
each unite part of Danvers with part of Peabody.[6] The
number of inhabitants in the Twelfth district is 36,713,
composed of 10,020 inhabitants of Danvers, and 26,633 in-
habitants of Peabody. The Thirteenth district includes
33,797 inhabitants, 14,927 of Danvers, and 19,270 of Pea-

---

[5] This action was filed first with the clerk of the Supreme Judicial Court
for the Commonwealth, as prescribed by art. 101, § 3, and was then
transferred to this court for Suffolk County. There the parties filed a state-
ment of agreed facts and the case was reserved and reported by a single
justice to the full court.

[6] The two districts in question are described as follows in the report of
the committee, and in St. 1977, c. 277, § 1:

"*Twelfth Essex.* — Consisting of precincts one, two and three of the
town of Danvers, and all precincts of wards one, two and three, and
precincts one and three of ward four, of the city of Peabody, all in the
county of Essex.

"*Thirteenth Essex.* — Consisting of precincts four, five, six, seven and
eight of the town of Danvers, and precinct two of ward four, and all
precincts of wards five and six, of the city of Peabody, all in the county of
Essex."

body. (The figures are taken from the statement of agreed facts.) The close relationship between the town and city is indicated by their histories. Danvers was part of Salem until 1752, when it separated and was incorporated. The south parish of Danvers, comprising what is now Peabody, separated from Danvers in 1855 and became known as South Danvers. In 1868 South Danvers took the name Peabody. Peabody was incorporated as a city in 1916.

The comprehensive report of the committee, which accompanied the redistricting bill, was 1977 House Doc. No. 5900. This document discusses at length both the committee's approach to the redistricting project and the many factors which it considered in recommending the 160 districts ultimately established by the Legislature. The report reviews the history of legislative redistricting in the Commonwealth, including the transition from districting on the basis of numbers of voters to that of numbers of inhabitants, reviewing the reasons therefor, and the changes required thereby in the State's decennial census. It also states the criteria that the committee followed in formulating the proposed districts, with statistical and other supporting data. The report lists five towns, including Danvers, which were divided into two parts, with each part having been included in a different district.[7] No explanation for the division of this or any other town was given. The report did indicate that the committee attempted to maintain the integrity of the various cities and towns; overriding consideration, however, was given to equalizing the weight of the votes of all citizens.[8]

When the House of Representatives was considering 1977 House Doc. No. 5900, it considered, but rejected, an alternative plan by which the Twelfth district consisted of all of Danvers, plus ward 6 of Peabody, and the Thirteenth district consisted of all of Peabody, except ward 6. Under that plan, the Twelfth district would not have been contiguous

---

[7] A sixth town, Ashland, was also similarly divided, but at its own request.

[8] See *infra* at 262.

because no part of ward 6 in Peabody abutted any part of Danvers.

When this alternative plan came for consideration on the floor of the House of Representatives, the proponents of the plan put forth the following arguments in its favor: (1) The plan would align the suburban section of Peabody (West Peabody) with Danvers, which also had a suburban character; (2) the plan would not disturb any of the surrounding districts; (3) the plan would divide Peabody, which had to be divided in any event, along logical lines of community interest; (4) the plan would preserve Danvers intact; (5) West Peabody is a newer, residential area of the city, in contrast to older parts of Peabody, and West Peabody has its own civic association as well as a separate column in the daily newspaper, the Salem News; (6) there had been movements in the past to have West Peabody stand as a separate municipality; (7) the plan would promote the constitutional mandate of preserving municipalities intact so far as possible; (8) if the alternative plan were not adopted, Danvers would be disenfranchised; and (9) the Legislature should not accede to political accommodation.

The proponents of the plan proposed by the committee in 1977 House Doc. No. 5900 put forth the following argument as to why that plan should be adopted: (1) the age and character of the housing in the Twelfth district generally differed from that of the Thirteenth district, i.e., the average age of a house in the Twelfth district is over fifty years and is generally of the two- and three-family type, while the average age of a house in the Thirteenth district is twenty years, and is generally of the single-family type; (2) the Twelfth district, unlike the Thirteenth, is characterized by the presence of and membership in certain church, fraternal and civic organizations; (3) the Twelfth and Thirteenth districts are separated in substantial part by major transportation routes; and (4) the proposed alternative plan would establish a noncontiguous district. With respect to this and the preceding paragraph, the parties agreed that

the arguments were put forth as stated, but they did not concede that the arguments as stated were true.

When the Senate was considering the same House Doc. No. 5900, it considered, but rejected, a second alternative plan, this one defining the Twelfth district as all of Danvers, as well as precinct 2 of ward 5 in Peabody, and all of ward 6 in Peabody, and the Thirteenth district as all of Peabody, except those parts which were proposed to become part of the Twelfth district. The resulting Twelfth district would have been contiguous, since precinct 2 of ward 5 in Peabody abutted Danvers. Under this alternative plan the number of inhabitants in the resulting districts would have been 35,080 in the Twelfth, and 35,430 in the Thirteenth. There is nothing in the statement of agreed facts to indicate the nature or extent of discussion, debate, or argument, if any, in the Senate with reference to 1977 House Doc. No. 5900 or the alternate plans proposed for the Twelfth and Thirteenth districts.

In addition, the statement of agreed facts indicated that in the 1976 State election, 120 of the 240 representative districts were comprised of two or more, or parts of two or more municipalities. In 104 of these multimunicipality districts the elected representative was from a municipality having the larger or the largest population of the several municipalities in the district; in the remaining sixteen of these districts the elected representative was from one of the smaller municipalities. It was also stated that in each of the State elections of 1964 and 1966, when the Fifth Essex representative district was composed of Danvers and Peabody as a two-member district, one resident from each municipality was elected representative.

Finally, the statement of agreed facts states that each party reserves the right to argue that any of the agreed facts, and any exhibit appended to the agreement, is neither relevant nor material to the issues to be decided. One exhibit is a group of certain "Census Tracts" based on the 1970 Federal census, purporting to show the general, social, labor force, and income characteristics of the population,

and the occupancy, utilization, financial, structural, and equipment characteristics of housing units in various divisions of Danvers and Peabody. While we may assume that certain recorded information concerning physical structures, particularly as to years when they were built, would still be relevant as of the 1975 decennial State census, the same may not be true as to the information concerning population characteristics. There is nothing in the statement of agreed facts to show whether these census tracts were available to the committee. We do not construe the statement of agreed facts or the reservation and report of the case to us as requiring us to find facts other than those agreed on by the parties. "It is settled . . . that courts cannot, for the purpose of determining the validity of legislation, receive evidence of the inducements and motives of the legislators in enacting it." *Morgan* v. *Banas*, 331 Mass. 694, 698 (1954), and cases cited therein.

It now becomes our duty to determine whether, on the agreed facts, St. 1977, c. 277, in so far as it relates to the Twelfth and Thirteenth districts, violates art. 101 of the Amendments to our Constitution, as the plaintiffs contend.

1. This court has frequently dealt with the subject of the judicial review of legislative acts. In *Commonwealth* v. *Blackington*, 24 Pick. 352, 355-356 (1837), Chief Justice Shaw stated: "It has generally been considered, that when an act has been passed soon after the adoption of the constitution, and by a legislature, many of the members of which may be presumed to have been members of the convention which adopted the constitution, and who had well weighed its objects and provisions, such act may be viewed somewhat in the light of a contemporaneous construction of the provisions of the constitution. It may well be considered by those who come later to the construction and exposition of the constitution, as affording some light in regard to the views and intentions of its founders. Still, if the statute now in force, can be shown to be plainly inconsistent with the provisions of the constitution, which is the fundamental law, controlling and restraining the government as well as

the people, it is the duty of the judicial tribunal so to declare; and it is the right of the subject to have the benefit of it. It is however hardly possible too often to repeat the familiar sentiment, that although this power of deciding on the constitutionality of legal enactments, is one clearly vested in the judicial department, it is to be resorted to and exercised with great caution and deliberation, and it is always to be presumed that a coordinate branch of the government has acted within the limits of its constitutional authority, until the contrary shall clearly and satisfactorily appear."

Similarly Chief Justice Rugg, in *Perkins* v. *Westwood*, 226 Mass. 268, 271 (1917), stated: "All rational presumptions are made in favor of the validity of every act of the legislative department of government, and the court will not refuse to enforce it unless its conflict with the Constitution is established beyond reasonable doubt. It will not be declared void unless it is impossible by any reasonable construction to interpret its provisions in harmony with the Constitution. These were early declared by this court to be fundamental principles of constitutional law, and they have been followed consistently for more than a century. *Portland Bank* v. *Apthorp*, 12 Mass. 252, 253 [1815]. *Wellington, petitioner*, 16 Pick. 87, 95 [1834]. *Opinion of the Justices*, 8 Gray, 20 [1857]; 211 Mass. 608, 614 [1912]. *Commonwealth* v. *People's Five Cents Savings Bank*, 5 Allen, 428, 431, 432 [1862]. *Commonwealth* v. *Hamilton Manuf. Co.* 12 Allen 298, 301 [1866]. *Northampton* v. *County Commissioners*, 145 Mass. 108, 109 [1887]. *Bogni* v. *Perotti*, 224 Mass. 152, 159 [1916]."

In *Slome* v. *Chief of Police of Fitchburg*, 304 Mass. 187, 189 (1939), we stated: "Judicial inquiry does not extend to the expediency, wisdom or necessity of the legislative judgment for that is a function that rests entirely with the lawmaking department. It is only when a legislative finding cannot be supported upon any rational basis of fact that can be reasonably conceived to sustain it that a court is empowered to strike down the enactment. We cannot say that

the instant statute is entirely lacking in such support. *Perkins* v. *Westwood*, 226 Mass. 268, 271 [1917]. *Lowell Co-operative Bank* v. *Co-operative Central Bank*, 287 Mass. 338, 343 [1934]. *Howes Brothers Co.* v. *Unemployment Compensation Commission*, 296 Mass. 275, 284 [1936]. *Standard Oil Co.* v. *Marysville*, 279 U.S. 582, 584 [1929]. *Cincinnati Soap Co.* v. *United States*, 301 U.S. 308 [1937]. *New York Rapid Transit Corp.* v. *New York*, 303 U.S. 573, 578 [1938]."

This court is not alone in applying this limited scope of judicial review of legislative acts. The Supreme Court, in describing its own power to review legislation, stated in *Chicago, Burlington & Quincy R.R.* v. *McGuire*, 219 U.S. 549, 569 (1911): "The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy*. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance."

On several occasions in the past, this court has been presented with cases specifically involving the review of the establishment of districts for election purposes, whether the districts were defined by the Legislature itself or by commissioners to whom the power of the Legislature was delegated. On these occasions we have applied the same general rule of limited judicial review.

In *Attorney Gen.* v. *Suffolk County Apportionment Comm'rs*, 224 Mass. 598, 607 (1916), we said: "The court would be slow to set aside an apportionment which appeared by any exercise of sound discretion to have followed the requirements of the Constitution and to be an approximation to equality. But where it is manifest on its face from a mere inspection of the apportionment that the Constitu-

tion has been transgressed, then the division made by the commissioners cannot stand. When fair minded men from an examination of the apportionment and division can entertain no reasonable doubt that there is a grave, unnecessary and unreasonable inequality between different districts, the Constitution has been violated and it is the duty of the court so to declare."

Similarly, in *Brophy* v. *Suffolk County Apportionment Comm'rs*, 225 Mass. 124, 128-129 (1916), it was stated: "The function of the court is not to review or revise the exercise of official judgment within its legitimate limits, but only to declare void a division and apportionment so vicious in its nature as to transcend the constitutional power of the commissioners. Something must be left to the commissioners, unless in substance the division and apportionment are to be made at last by the court. If this apportionment on its face does not indicate a manifest abuse of power in ignoring the mandate of the Constitution, or an evasion or direct infraction of the principles stated in our earlier decisions, the court cannot interfere to set it aside."

In *Attorney Gen.* v. *Secretary of the Commonwealth*, 306 Mass. 25, 30, 32 (1940), we were required to review St. 1939, c. 507, which by § 2 established senatorial districts pursuant to art. 71 of the Amendments to our Constitution. We quoted with approval the language in *Perkins* v. *Westwood*, quoted, *supra* at 254, and applied the same presumption of validity in reviewing the apportionment plan established by the commissioners. We said: "In accordance with fundamental principles the question for our decision is whether it is established beyond reasonable doubt that such a variation and such combinations are beyond the scope of legislative power so that the legislative enactment must be struck down."

More recently, in *Moore* v. *Election Comm'rs of Cambridge*, 309 Mass. 303 (1941), we reviewed the constitutionality of statutes relating to the Plan E form of municipal government, with proportional representation. We said, "This court is concerned only with the power of the

Legislature to enact laws, the question of their expediency or the policy behind them being matters purely within the legislative discretion." *Id.* at 311.

Finally, in deciding the constitutionality of legislative acts, it "must never be forgotten, that [the Constitution of the Commonwealth] was not intended to contain a detailed system of practical rules, for the regulation of the government or people in after times; but that it was rather intended, after an organization of the government, and distributing the executive, legislative and judicial powers, amongst its several departments, to declare a few broad, general, fundamental principles, for their guidance and general direction." *Commonwealth* v. *Blackington,* 24 Pick. 352, 356 (1837). *Moore* v. *Election Comm'rs of Cambridge, supra* at 312.

2. We turn now to the question of the constitutionality of St. 1977, c. 277, as it relates to the Twelfth and Thirteenth districts, with specific reference to the provision of art. 101, § 1, that each of the representative districts "shall be formed, *as nearly as may be,* without uniting . . . parts of cities and towns, into one district" (emphasis supplied). The words "as nearly as may be" are not original to art. 101. They have appeared in all the Amendments to the Constitution of the Commonwealth dealing with the establishment of representative districts, starting with arts. 21 and 22, approved May 1, 1857. As originally approved, art. 21 required that the 240 representatives be apportioned "to the several counties of the commonwealth, equally, as nearly as may be, according to their relative numbers of legal voters," and that the number assigned to each county be apportioned "as nearly as may be, according to the relative number of legal voters in the several districts of each county." Article 22 provided that "[t]he general court shall . . . divide the commonwealth into forty [senatorial] districts of adjacent territory, each district to contain, as nearly as may be, an equal number of legal voters . . . *provided, however,* that no town or ward of a city shall be divided therefor; and such districts shall be formed, as nearly as may be, without

uniting two counties, or parts of two or more counties, into
one district" (emphasis in original). Comparable language
relating both to numbers and territories, modified in each
case by the same words, "as nearly as may be," appears in
each of the subsequent amendments relating to represent-
ative and senatorial districts to date, viz.: arts. 71 and 72,
approved November 4, 1930, and November 8, 1938, re-
spectively; art. 92, approved November 3, 1970; and art.
101, approved November 5, 1974.

The words "as nearly as may be" as used in the constitu-
tional provisions on redistricting have been the subject of a
number of opinions by this court. Although most of these
decisions dealt with the meaning of the words in reference
to the numerical size of the districts, rather than their
geographical makeup, there is a theme common to all of
them which is of relevance to the question before us. In the
earliest case, *Attorney Gen.* v. *Suffolk County Apportion-
ment Comm'rs,* 224 Mass. 598, 604-606 (1916), this court
said that in creating the districts "there must be the nearest
approximation to equality of representations which is rea-
sonably practicable. The words of the amendment, that the
representatives must be apportioned upon the basis of
equality 'as nearly as may be,' does not mean mathematical
accuracy of equality. They do not aptly express that idea.
The words import some flexibility in the division. Some-
thing is left to the sound judgment of the body charged with
making the apportionment and division. . . . It is not every
inequality between the several representative districts
which will be fatal in a constitutional sense. It is inevitable
that there must be in the several districts some variation [in
the number of voters] . . . . These variations may be aug-
mented where there are numerous towns and cities with dif-
ferent numbers of wards and of legal voters. The difficulties
may be considerable. There is abundant room for the exer-
cise of reason and judgment in the formation of the districts
and in the disposition to be made of the excess or deficiency
of the number of voters as compared with the unit of
representation or ratio between voters and representatives,

which unavoidably must be found even with the most conscientious efforts. Many questions may arise which cannot be solved by computation and which may require the exercise of a high degree of sagacity. A wide discretion must of necessity be exercised by the commissioners."

In *Brophy* v. *Suffolk County Apportionment Comm'rs*, 225 Mass. 124, 128 (1916), again addressing the requirement of art. 21 that districts be equal, "as nearly as may be, according to the relative number of legal voters in the several districts," we said: "The division and apportionment of the present report are not ideal. Doubtless a closer approximation to equality might have been made. But the Constitution has placed the duty of making the division and apportionment upon the commissioners and not upon the court. There is room for some diversity of honest opinion in selecting among the various possible methods the best one for forming the districts. Sagacity is demanded in reaching a right determination. The division and apportionment is not a mere example in arithmetic. It involves the exercise of sound judgment and practical wisdom."

The language quoted above from *Brophy* was repeated with approval in *Attorney Gen.* v. *Secretary of the Commonwealth*, 306 Mass. 25 (1940), which appears to be the first case in which this court addressed a constitutional requirement (in art. 22) that senatorial districts, be "formed, as nearly as may be, without uniting" two or more political subdivisions — in that case, counties. We noted the requirements of art. 22 that each district "contain, as nearly as may be, an equal number of legal voters," and that the districts be "formed, as nearly as may be, without uniting two counties, or parts of two or more counties, into one district." We said: "The language of these requirements, by the inclusion therein, in each instance, of the phrase 'as nearly as may be,' recognizes that there may be some variation among the senatorial districts from exact mathematical equality of numbers of legal voters, and that in forming such districts there may be some combinations of units — towns or wards of cities — located in different counties

without violation of the constitutional requirements. . . .
Subject to the limitations imposed by the Constitution,
however, the selection of the towns and wards to be com-
bined in a senatorial district is a matter for the judgment
and discretion of the General Court and, furthermore, the
phrase 'as nearly as may be,' used in connection with the re-
quirement of equality of numbers of legal voters in the
several districts and also in connection with the prohibition
against uniting counties or parts thereof in one district, does
not import that the General Court must make the division
which is literally the nearest to such equality and to the
avoidance of county combinations that any ingenious mind
can devise. . . . It is not to be assumed that the people in
adopting the governing constitutional provision intended to
impose upon the legislative department a duty so largely
ministerial in nature. On the contrary, it is a necessary con-
clusion that a statutory division, whereby the combinations
of towns and wards in senatorial districts reasonably ap-
proximate equality of numbers of legal voters and the
avoidance of county combinations, cannot be overthrown
by this court merely because it is demonstrated, or the court
is of opinion, that a somewhat better division in these
respects could have been made. And while undoubtedly
such approximate equality within the several senatorial
districts is an essential element of a constitutional division of
the Commonwealth into such districts, the fact that both
the provision requiring equality of numbers and the provi-
sion requiring avoidance of county combination districts are
modified by the same phrase, 'as nearly as may be,' leaves
some scope for the exercise by the General Court of its judg-
ment and discretion in determining the extent to which
either of these requirements shall yield to the other. The
Constitution does not direct that either of them yield to the
other, but does prohibit any departure from either of them
that is unreasonable in the light of all the limitations im-
posed upon legislative action." 306 Mass. at 31-34.

Having thus reviewed our judicial precedents for guid-
ance on the meaning of the words, "as nearly as may be,"

which have appeared in our constitutional provisions for the apportionment of Legislatures for now 121 years, we turn to the application of the teaching of those precedents in deciding the question before us.

Article 101, § 1, of the Amendments requires that the Legislature divide the Commonwealth into 160 representative districts, and states that "such districts shall be formed, as nearly as may be, without uniting two counties or parts of two or more counties, . . . or a city and a town, or parts of cities and towns, into one district." The Legislature, by St. 1977, c. 277, § 1, divided the Commonwealth into 160 representative districts, and in the process they crossed county lines nineteen times in forming districts, and they also formed a number of districts by uniting cities and towns, or parts of cities and towns, into one district. A total of twenty-four cities and nine towns were affected by this process of division and resulting unification of a part thereof with a part of another municipality.[9]

With minor exceptions not here material, the Legislature in enacting St. 1977, c. 277, forming the 160 representative districts, acted in accordance with the recommendations of the committee contained in House Doc. No. 5900. The seventeen members of that committee were unanimous on all parts of the report except that part establishing the division challenged here, to which two members dissented.

While the report makes no attempt to recite the factors which influenced the recommendation for the committee's treatment of Danvers, or for the similar treatment of any other municipality which was in part united with a part of another municipality in forming a district, it did state in

[9] The cities affected by uniting parts thereof with parts of other municipalities to form a district are: Boston, Brockton, Cambridge, Chelsea, Chicopee, Fall River, Haverhill, Holyoke, Lawrence, Lowell, Lynn, Malden, Medford, New Bedford, Newton, Peabody, Pittsfield, Quincy, Revere, Somerville, Springfield, Taunton, Waltham, and Worcester. The towns thus affected are: Arlington, Brookline, Danvers, Framingham, Randolph, Stoneham, Westwood, Weymouth, and Wilmington.

broad terms the constitutional and legal principles and other principles by which the committee was guided in deciding on and recommending the districts to be formed. The report reflects research in considerable depth by or in behalf of the committee in the discharge of its responsibility. In c. 1 of the report the committee discusses the historical background of redistricting in the Commonwealth; in c. 2 it describes the 1975 State decennial census, and the revision of the ward and precinct lines in anticipation of the redistricting pursuant to art. 101; and in c. 3 it states the constitutional criteria and other criteria followed in recommending the proposed districts, stressing the importance of the "mandate of the House Cut Amendment [art. 101] that the division of individual municipalities among representative districts be minimized." 1977 House Doc. No. 5900, at 53. The report states that "[w]herever possible and practical, under existing circumstances, then, the integrity of the various cities and towns has been maintained, and consideration has been given to the desire of localities in multi-municipal representative districts to be grouped on a community of interest basis. However, the overriding object has been the principle of substantial equality of population among the various representative districts, so that the vote of one citizen is approximately equal in weight to that of any other citizen of the Commonwealth." *Id.* at 59. The committee also stated that while "it was found necessary to cross county lines in the instance of 19 districts in order to meet 'one man, one vote' standards, or to compensate for geographical problems of one sort or another, . . . [yet, b]asically, however, traditional county lines were respected and maintained wherever feasible." *Id.* at 59-60.

Despite the great number of difficult decisions which the committee and the Legislature had to make in arriving at a mosaic of 160 representative districts which would meet the constitutional test of art. 101, the present judicial challenge is limited to the Twelfth and Thirteenth Essex districts.

Article 101 by its clear language contemplates and anticipates that some of the resulting districts might require

the uniting of "parts of cities and towns, into one district," with the caution that the forming of the districts be accomplished "as nearly as may be" without uniting such parts of municipalities. The plaintiffs, who contend that St. 1977, c. 277, § 1, violates art. 101 in that regard, have the burden of proof on that claim. In this inquiry every reasonable presumption must be made in favor of the constitutionality of the statute. *Brophy* v. *Suffolk County Apportionment Comm'rs*, 225 Mass. 124, 128 (1916). Thus, the plaintiffs cannot prevail in this procceeding unless they establish beyond a reasonable doubt that it is impossible by any reasonable construction to interpret the statute in harmony with art. 101. *Attorney Gen.* v. *Secretary of the Commonwealth*, 306 Mass. 25, 30 (1940). The fact that some legislators, during the course of the legislative proceedings on St. 1977, c. 277, and the plaintiffs, during the course of the proceedings before this court, suggested or proposed alternatives for the Twelfth and Thirteenth districts which would have avoided uniting parts of Danvers and Peabody "in itself, is not fatal to the statutory division. . . . It has weight only so far as it bears upon the question whether the statutory division . . . [combines parts of a city and a town] to an extent so unreasonable as to be 'vicious in its nature.' See *Brophy* v. *Suffolk County Apportionment Comm'rs*, 225 Mass. 124, 128 [1916]." *Attorney Gen.* v. *Secretary of the Commonwealth, supra* at 35.

Mindful of the fact that the primary constitutional responsibility for the apportionment of representative districts rests with the Legislature, and that the function of the judiciary in considering the constitutionality of the action of the Legislature in regard thereto is limited as stated in the previous opinions of this court discussed above, we conclude that the plaintiffs have not sustained the burden which they assumed in bringing this action.

It is ordered that judgment be entered (a) declaring that St. 1977, c. 277, does not violate the provisions of art. 101, of the Amendments to the Constitution of the Commonwealth in so far as it establishes the Twelfth and Thirteenth

Essex representative districts, and (b) denying the request for injunctive relief.

*So ordered.*

WILKINS, J. (dissenting). The plaintiffs have shown a constitutional violation in the formation of two representative districts each made up of portions of the town of Danvers and the city of Peabody.

It is clear that the Legislature must have a measure of discretion in performing its difficult task of forming representative districts. Certain municipalities may have to be divided, and precise numerical equality cannot be expected. Where, however, approximate numerical equality can be achieved without dividing a municipality and where an entire municipality can be kept in one district without a "ripple effect" on other defined districts, dividing that municipality is unconstitutional in the absence of some reason justifying the division.

In my view, the bifurcation of Danvers is "unnecessary and incompatible with reasonable effort to conform to the requirements of the Constitution." See *Brophy* v. *Suffolk County Apportionment Comm'rs*, 225 Mass. 124, 126 (1916). Peabody must be divided in any event because its population is too large for a single representative district, and part of Peabody must be joined with other territory because Peabody's population alone is too small for two representative districts. But Danvers need not be divided. It has a population of 24,947, slightly more than two-thirds of the population of an "ideal" district.[1]

---

[1] It is an historical irony that the town of Danvers, which then included what is now the city of Peabody, was part of the salamander-shaped senatorial district from which was coined the word "gerrymander," a combination of the word "salamander" and the name of Governor Elbridge Gerry. See St. 1812, c. 97; 3 Commonwealth History of Massachusetts 458-459 (A.B. Hart ed. 1929).

On the undisputed facts, one method of avoiding a violation of the specific constitutional direction is self-evident, and I can conceive of no reason why the division of Danvers is either reasonable or necessary to conform with any other constitutional standard concerning the establishment of representative districts. The opinion of the court suggests no such reason. The defendant advances none. In my view, the people intended the words, "as nearly as may be," to impose a higher standard than the court defines. I reject the court's notion that a division of a municipality is unconstitutional only if it is so unreasonable as to be vicious in nature. *Merriam* v. *Secretary of the Commonwealth, supra* at 263 (1978).