Connolly, J.
The plaintiffs, Hilary Goodridge and Julie Goodridge, David Wilson and Robert Compton, Michael Horgan and Edward Balmelli, Maureen Brodoff and Ellen Wade, Gary Chalmers and Richard Linnell, Heidi Norton and Gina Smith and Gloria Bailey and Linda Davies (collectively, “the plaintiffs”), are seven same-sex couples who have applied for, and been denied, a marriage license. The plaintiffs filed their complaint in April 2001 seeking a declaration that their exclusion from marriage violates the present statutory scheme, the exercise of the fundamental right to marry the partner of their choice, the equality protections of the Massachusetts Constitution and their expressive rights. This matter is now before the court on the parties’ cross motions for summary judgment. For the reasons set forth below, the plaintiffs' motion for summary judgment is DENIED and defendants’ cross motion for summary judgment is ALLOWED.

BACKGROUND

This case concerns the most fundamental institution: marriage. The plaintiffs are seven same-sex couples who want the state and society to recognize their commitment to each other through marriage.
Plaintiffs Hilary Goodridge and Julie Goodridge have shared their lives with each other for fourteen years. They seek to provide their daughter with the social recognition and security which comes from having married parents.
David Wilson and Robert Compton believe that marriage is a special expression of commitment that is uniquely understood by others, and they seek to marry to express their love for each other. They also seek to marry to provide maximum legal security to and for each other as they age, plan for retirement and face health-related problems.
Michael Horgan and Edward Balmelli want to marry to be part of the larger community of married persons. They desire both the legal security and social recognition marriage confers.
Maureen Brodoff and Ellen Wade have lived together in the Boston area for twenty years. The couple shares a twelve-year-old daughter. They seek to marry to secure the legal protections and obligations that civil marriage provides.
Gary Chalmers and Rich Linnell are both teachers residing in the Worcester area. They seek to marry to provide legal protection for themselves and their family. They want their eight-year-old daughter to have the security provided by her fathers’ love and also the security that would come from her parents’ legal bond to one another.
Heidi Norton and Gina Smith, together with their two sons, have made their home in Western Massachusetts. They seek to marry to make a statement for themselves and others about their enduring love and commitment to one another and also because they want their sons to grow up in a world where their parents’ relationship is legally and communally respected.
Lastly, Gloria Bailey and Linda Davies, both psychotherapists residing on Cape Cod, have been in a loving and thriving personal relationship for thirty years and have worked as business partners for the last twenty-five years. They seek to protect the assets they have accumulated together over those many years in the same way a spouse would be protected. But even more, they seek to marry so the world can see them as they see themselves — a deeply loyal and devoted couple that is each other’s mate in every way. *592 They also seek the legal security and emotional peace of mind that flows from being a married couple.

DISCUSSION

Massachusetts Rule of Civil Procedure 56(c) grants summary judgment to a moving party if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Comm’ r of Correction, 390 Mass. 419, 422 (1983). “The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue.” Pederson v. Time, Inc., 404 Mass. 14, 17(1989). The court should deny a motion for summary judgment when the nonmoving party presents evidence of genuine issues of fact entitling him to a trial. Community Nat’l Bank v. Dawes, 369 Mass. 550, 556 (1976). Here, the parties agree that there are no genuine issues of material fact in dispute and ask the court to rule on the statutory and constitutional claims presented.[3]
I. Statutory Claim
Plaintiffs argue that the Commonwealth’s marriage statute should be interpreted gender-neutrally so as not to restrict marriage to a man and a woman. To understand how the marriage statutes should be interpreted, it is necessary to explore the application of the word marriage, the construction of the marriage statutes and finally, the historical purpose of marriage. After analyzing the Commonwealth’s marriage statutes, the court rejects plaintiffs’ argument.
A. Application of the word “Marriage”
The word marriage is used to recognize a state of wedlock. Ex parte Suzanna, 295 F. 713, 714-15 (D.Mass. 1924). The Supreme Judicial Court defines marriage as follows:
“Marriage is ... a civil contract, founded in the social nature of man, and intended to regulate, chasten, and refine the intercourse between the sexes; and to multiply, preserve, and improve the species. It is an engagement by which a single man and single woman, of sufficient discretion, take each other as husband and wife. From the nature of the contract, it exists during the lives of the two parties, unless dissolved for causes which defeat the object of marriage . . .” Inhabitants of Milford v. Inhabitants of Worcester, 7 Mass. (1 Tyng) 48, 51 (1810).
Moreover, the Supreme Judicial Court has interpreted “marriage,” within Massachusetts’ statutes, “as the union of one man and one woman.” Id. Adoption of Tammy, 416 Mass. 205, 207-08 (1993) (“the laws of the Commonwealth do not permit [a same-sex couple] to enter into a legally cognizable marriage”). See also Connors v. City of Boston, 430 Mass. 31, 37 (1999) (domestic partner is not “spouse” within meaning of health insurance statute). Likewise, other jurisdictions’ courts have interpreted their marriage statutes to apply only to one man and one woman. Baker v. Vermont, 744 A.2d 864, 868-69 (Vt. 1999): Storrs v. Holcomb, 645 N.Y.S.2d 286, 287-88 (N.Y.Sup.Ct. 1996); Dean v. District of Columbia, 653 A.2d 307, 312-16 (D.C. 1995); Baehr v. Lewin, 852 P.2d 44, 56-57 (Haw. 1993); Singer v. Hara, 522 P.2d 1187, 1191 (Wash.Ct.App. 1974); Jones v. Hallahan, 501 S.W.2d 588, 589 (Ky. 1973); Baker v. Nelson, 191 N.W.2d 185, 186 (Minn. 1971); Anonymous v. Anonymous, 325 N.Y.S.2d 499 (N.Y.Sup.Ct. 1971). See also Rutgers Council v. Rutgers, 689 A.2d 828, 834-35 (N.J.Super.Ct.App.Div. 1997) (same-sex domestic partner not “spouse” within meaning of health insurance law and contract); Matter of Cooper, 592 N.Y.S.2d 797, 798-99 (N.Y.App.Div. 1993) (survivor ofhomosexual relationship not “surviving spouse” for purpose of federal immigration law); De Santo v. Barnsley, 476 A.2d 952, 953 (Pa.Super. 1984) (two men could not divorce because they could not “marry”).[4]
B. Statutory Construction
Second, the statutory construction of the marriage statutes demonstrates the Legislature’s intent to limit marriage to a man and a woman. To ascertain the Legislature’s intent, it is necessary to examine the statutes’ words, construed by the ordinary and approved usage of language, the cause of the statute’s enactment, “the mischief or imperfection to be remedied and the main object to be accomplished ...” Commonwealth v. Smith, 431 Mass. 417, 421 (2000). Because marriage is not defined in the statute itself, the term must be construed as it is “commonly understood. " Nile v. Nile, 432 Mass. 390, 394(2000). A term’s plain and ordinary meaning is determined by its dictionary definition. Town of Boylston v. Comm’r of Revenue, 434 Mass. 398, 405 (2001). Accordingly, Black’s Law Dictionary (7th ed. 1999) defines “marriage” as “(t]he legal union of a man and woman as husband and wife,” and defines “husband” as “[a] married man.” Id. at 986, 746. Similarly, Webster’s Third New International Dictionary (1964) defines marriage as “the state of being united to a person of the opposite-sex as husband or wife.” Id. at 1354.
Additionally, courts look at a term’s meaning when the Legislature enacted, codified or amended the statute to ascertain its meaning. In the mid-eighteenth century, when the Legislature codified many of the marriage laws in their present form, “(t]he word marriage [wa]s used to signify ... a civil status, existing in one man and one woman legally united for life.” Joel Prentiss Bishop, Commentaries on the Law of Marriage §29 (1856); see also Milford, 7 Mass. at 51. The second edition of Black’s Law Dictionary, published in 1919, similarly defined marriage as the “civil status of one man and one woman united in law for life, for the discharge to each other and the community of the duties legally incumbent on those whose association is founded on the distinction of sex.”
*593 Further evidence of the Legislature’s intent to restrict marriage to one man and one woman is the use of gender-specific terms, not only in the marriage statutes themselves, but also in those concerning the related subjects of divorce and domestic relations. See Adams, 486 F.Sup. at 1122; Baker v. Vermont, 744 A.2d at 313-14; Singer, 522 P.2d at 1191: Baker v. Nelson, 191 N.W.2d at 186; Dean, 653 A.2d at 313-14; Baehr, 852 P.2d at 60. For example, an entire chapter of the General Laws, chapter 209, is entitled, “Husband and Wife.” See also G.L.c. 207, §1 (“man,” “mother, grandmother, daughter, granddaughter, sister, stepmother,” etc.); §2 (“woman,” “father, grandfather, son, grandson, brother, stepfather," etc.); c. 208, §4 (“lived together as husband and wife”); §23 (“woman,” “maiden name,” “husband”); §25 (“wife”); §40 (“cohabitating as husband and wife”); c. 209, §§2-9 (“married woman,” “husband”). The use of gender-specific terms thus shows the Legislature’s intent to restrict marriage to a man and a woman.[5]
C. History of Marriage
The history of marriage further illuminates the purpose of the modern marriage statutes. Massachusetts enacted its first marriage statutes in colonial times. See Commonwealth v. Munson, 127 Mass. 459, 460 (1879). These statutes derived from English common law, which, in turn, incorporated English ecclesiastical law. Bishop, Commentaries §§7-18; Homer H. Clark, Jr., The Law of Domestic Relations in the United States 24 (2d ed. 1988); Commonwealth v. Knowlton, 2 Mass. (1 Tyng) 530, 534 (1807). Marriage emphasized the unity of husband and wife. Nancy F. Cott, Public Vows: A History of Marriage and the Nation 10 (2000); see also Clark, supra at 24 (“According to the English law, and to its American counterpart, the legal definition of marriage was clear and quite specific . . . [It was] a . . . monogamous relationship between a man and a woman . . .”). Within that unity, the man and woman divided gender-specific responsibilities with the husband responsible first for farming and later for financial support and the wife responsible for domestic work, childbearing, and child rearing. Id. at 7; Steven Mintz & Susan Kellogg, Domestic Revolutions: A Social History of American Family Life 47, 50-56 (The Free Press 1988). In particular, women were expected to bear many children at short intervals during their childbearing years. Mintz & Kellogg, supra, at 51. Even as the concept of marriage shifted to a more companionate model, that model “did not imply sexual equality or a blurring of gender boundaries.” Id. at 47; see also Cott, supra, at 157-58. Accordingly, the statutes that derived from the common-law understanding of marriage as the union of a man and a woman should be interpreted consistent with that standard. Commonwealth v. Burke, 392 Mass. 688, 690 (1984) (“As has long been recognized, a statute should not be interpreted as being at odds with the common law unless the intent to alter it is clearly express”).
The state recognizes marriage as the most important civil institution, “the very basis of tire whole fabric of civilized society.” Bishop, supra, §32. “Marriage is a social institution, or status, in which, because the foundations of the family and the domestic relations rest upon it, the Commonwealth has a deep interest to see that its integrity is not put in jeopardy, but maintained.” Coe v. Hill 201 Mass. 15, 21 (1909). This is accomplished primarily through the use of licenses. Grossbend, supra, at 93 (characterizing licensing as “society’s first line of defense against unwanted marriages”). Indeed, early cases show the state’s interests in preserving a union for procreation. Milford, 7 Mass. at 51; Reynolds v. Reynolds, 85 Mass. (3 Allen) 605, 610 (1862) (nullifying marriage because wife who was pregnant by another man when she married “could not properly assume the duties of wifehood[,] . . . the essential and material elements on which the marriage relation rests”); Smith v. Smith, 171 Mass. 404, 408 (1898) (nullifying marriage because husband had incurable syphilis, “leavling] him no foundation on which the marriage relation could properly rest”); see also Singer, 522 P.2d at 1195 (“Marriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race"); Adams, 486 F.Sup. at 1124 (“the main justification ... for societal recognition and protection of marriage is procreation, perpetuation of the race”). The history of marriage therefore demonstrates a state interest in preserving a union for procreation because same sex couples must go outside the relationship to procreate and, therefore, they cannot accomplish the “main object” of marriage as it is historically understood. Smith, 431 Mass. at 421. See e.g., Adams, 486 F.Sup. at 1123; see also Grossbend, supra, at 108 (in homosexual union, “none of the ends of matrimony would be thereby established”; quoting Prentiss, supra, at 162).
Based on the legal application of the word “marriage,” the construction-of the marriage statutes and the history of marriage, Massachusetts’ marriage statutes cannot support same-sex marriage.
II. Constitutional claims
Plaintiffs assert that the right to marry the person of their choice is a fundamental right under the Massachusetts Constitution.[6] Therefore, to construe the state marriage statutes to exclude same-sex couples is unconstitutional. When faced with a constitutional challenge to a Massachusetts law, a statute is presumed to be constitutional. See St. Germaine v. Pendergast, 416 Mass. 698, 703 (1993). To overcome this presumption, the plaintiffs “must demonstrate beyond a reasonable doubt that there are no conceivable grounds supporting its validity.” Id. This deferential standard is rooted in separation of powers principles, which are even stronger when a court is asked to *594 invalidate, rather than simply interpret, a legislative enactment. “(I]n deciding the constitutionality of legislative acts, it 'must never be forgotten that (the Constitution of the Commonwealth) was not intended to contain a detailed system of practical rules, for the regulation of the government or people in after times; but that it was rather intended, after an organization of the government, and distributing the executive, legislative and judicial powers amongst its several departments, to declare a few broad, general, fundamental principles, for their guidance and general direction.’ ” Merriam v. Secretary of the Commonwealth, 375 Mass. 246, 257 (1978), quoting Commonwealth v. Blackington, 41 Mass. (24 Pick.) 352, 356 (1837). Furthermore,
although the power of deciding on the constitutionality of legal enactments is one clearly vested in the judicial department, it is to be resorted to and exercised with great caution and deliberation, and it is always to be presumed that a coordinate branch of the government has acted within the limits of its constitutional authority, until the contrary shall clearly and satisfactorily appear.
Id. at 254, quoting Blackington, 41 Mass. at 356.
Thus, while the plaintiffs must overcome a strong presumption of constitutionality, the Court also recognizes that the application of the Constitutional protections must be flexible enough to meet changing circumstances. John Donnelly & Sons, Inc. v. Outdoor Advertising Bd., 369 Mass. 206, 218 (1975).
A. Same-sex Couple’s Right to Marry Under the Massachusetts Constitution
Plaintiffs contend that several provisions of the Massachusetts Constitution guarantee the fundamental right to marry the person of their choice. Specifically, the liberty principles embodied in Articles l,[7] 10[8] and 12[9] and the due process protections embodied in Pt. 2, c. 1, Art.[10] The plaintiffs also claim that their exclusion from marriage violated their substantive right to liberty invoked in Articles 1 and 10. Mendoza v. Commonwealth, 423 Mass. 771, 778-79 (1996).
To determine whether a constitutional right exists, the right must be specifically identified. Washington v. Glucksberg, 521 U.S. 702, 721-24 (1997) (requiring “careful description” of asserted constitutional right and rejecting description of "right to die” or “right to choose time and manner of death” in favor of right of “mentally competent, terminally ill adult to commit physician-assisted suicide”). Otherwise, it is not possible to determine whether the framers intended to create such a right; whether the right has been infringed; and if so, whether the infringement is justified. The Constitutional provisions cited by the plaintiffs “should be interpreted in the light of the conditions under which [they were] framed, the ends which [they] were designed to accomplish, the benefits which [they] were expected to confer and the evils [they were] hoped to remedy. [Their] words are to be given their natural and obvious sense according to common and approved usage at the time of [their] adoption ...” Mazzone v. Attorney General, 432 Mass. 515, 526 (2000) (internal quotations omitted). Thus, because there is a fundamental difference between constitutions and statutes, constitutional interpretation places a greater reliance on text and history than modern judicial precedents. See McDuffy v. Secretary of Executive Office of Educ., 415 Mass. 545, 600 (1993); Akhil Amar, The Bill of Rights: Creation and Reconstruction 3-4, 301-07 (1998).
1. The Right to Marry under Articles 6 and 7 of the Declaration of Rights
Articles 6 and 7 of the Massachusetts Declaration of Rights do not guarantee plaintiffs the right to marry. In the landmark case, Baker v. Vermont, 744 A.2d 864 (Vt. 1999), the Vermont Supreme Court, relying solely on the “common benefits” provision of the Vermont Constitution, invalidated Vermont’s marriage statutes. Id. at 869-86. The Vermont Supreme Court ordered the state legislature to extend the benefits and protections that flow from marriage to same-sex couples. Id. at 867.
Massachusetts’ Constitution does not contain any provisions that are analogous to the “Common Benefits” clause found in Vermont’s Constitution. Article 6[11] “prohibits the improper use of state power for private interests.” Commonwealth v. Ellis, 429 Mass. 362, 371 (1999). Specifically, the framers intended the provision to prohibit hereditary titles, public offices, or special privileges, as opposed to those earned by public service.[12] See Sheridan v. Gardner, 327 Mass. 8, 15 (1964); Brown v. Russell, 166 Mass. 14, 22 (1896); Hewitt v. Charier, 33 Mass. (16 Pick.) 353, 355 (1835). Article 6’s legislative history supports this text-based construction. Mazzone, 432 Mass. at 526. The framers intended Article 6 to remedy evils such as conferring hereditary titles, offices, or privileges, akin to the peerages and related privileges conferred by the Crown in England. Brown, 166 Mass. at 22; Bernard Bailyn, The Ideological Origins of the American Revolution 279-80 n.46 (quoting John Adams’ “Sixth principle of revolution!,] . . . the necessity of resisting the introduction of a royal or Parliamentary nobility or aristocracy into the country”); Willi Paul Adams, The First American Constitutions: Republic Ideology and the Making of State Constitution in the Revolutionary Era 166 (1980) (“The ideas of earthly superiority, preeminence and grandeur are educational, at least acquired, not innate”) (quoting James Otis, A Vindication of the Conduct of the House of Representatives of the Province of the Massachusetts Bay 15, 17-20 (1764)). In accordance with its language and history, this provision has been applied primarily in the context of public offices or employment. See Brown, 166 Mass. at 23-27 (applying Articles 6 and 7 to invalidate absolute veterans’ preference for “public office” but questioning whether *595 those articles extend, more generally, to public employment or to private members of professions that serve the public, such as doctors); Sheridan, 347 Mass, at 8 (finding Article 6 inapplicable to opportunity to serve on unpaid commission because not hereditary title or office); White, 428 Mass. at 255 (limiting Article 6 to absolute preferences for public employment and therefore rejecting challenge to statute requiring that qualified disability retirees be reinstated to public employment); Opinion of the Justices, 303 Mass. 631, 654 (1939) (applying Articles 6 and 7, among other provisions, to opine that proposed statute excluding married women from public employment would be unconstitutional).
Even where a statute is deemed to confer special privileges within the meaning of Article 6, it does not violate Article 6 unless the challenged statute’s purpose, not merely its indirect or incidental effect, is to confer such privileges. Hewitt, 33 Mass. at 355-56. Further, courts defer to the Legislature’s judgment to determine whether there is a legitimate purpose to confer such benefits. See Ellis 429 Mass. at 371; see also Opinion of the Justices, 354 Mass. 799, 801 (1968) (accepting [Legislature’s] mandate as authoritative as to whether statute serves a “legitimate public good” (internal quotations omitted)). Because the marriage statutes do not concern public employment, were not enacted for the purpose of conferring special privileges, and embody a legislative determination that limiting marriage to opposite-sex couples furthers the public interest, Article 6 affords no basis for invalidating those laws.
Article 7[13] establishes the people’s right to institute and change their form of government for the common good. See Brown, 166 Mass. at 21-22; Ellis, 429 Mass. at 372 n.14. The framers derived this provision from the Declaration of Independence, which asserted the people’s right to change their government as the basis for declaring independence from England.[14] The framers employed the term “common good,” interchangeably with the term “public good” during the Revolutionary period. Adams, supra, at 218. These terms derived from the Declaration of Independence, which identified as the first evil to be remedied the King’s refusal to assent to colonial laws, “the most wholesome and necessary for the public good.” Id. at 221-22. The article’s purpose, like the Declaration from which it was derived, was to ensure that under our government, as opposed to English colonial rule, a representative legislative body would determine the public good. The framers “presupposed not the uniformity of the private interests but only the possibility of resolving conflicts within the framework of the new political system . . . They assumed that with the help of a fair system of representation, conflicts could be resolved and the common good achieved.” Id. at 229. Thus, rather than protect individual interests, this provision was intended to “ruthlessfly] subordinate]” those interests to those of the public as a whole, as determined by the legislature.[15] Id. at 223, 223-29: see also Alexander J. Cella, The People of Massachusetts, A New Republic, and the Constitution of 1780: The Evolution of Principles of Popular Control of Political Authority 1774-1780. 14 Suffolk U. L. Rev. 975, 1004 (Summer 1980) (”[T]he Constitution of 1780 . . . reflected to an extraordinary high degree a popular willingness to subordinate private interests ... to the common good”).
Plaintiffs challenge the statutory classification for marriage under Article 7, Town of Brookline v. Secretary of the Commonwealth, 417 Mass. 406, 423 n.18 (1994) (“We have never held that art. 7 creates an equal protection right . . .”). “A statutory discrimination will not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it.” Connor v. Metro. Dist. Water Supply Comm’n, 314 Mass. 33, 38 (1943). Moreover, statutory classifications will not be set aside if there is a fair and substantial relationship to the Legislature’s objective. Opinion of the Justices to the Senate, 303 Mass. at 648. The Supreme Judicial Court, drawing from the article’s history and purpose, construes Article 7 as the right of the people to institute and change government. Ellis, 429 Mass. at 372 n.14. Thus, Article 7, like Article 6, provides no basis for invalidating the Legislature’s decision to limit marriage to opposite-sex couples.
2. Liberty and Due Process Provisions of the Massachusetts Constitution
Several provisions of the Massachusetts Constitution embrace the values of liberty, freedom and equality. For example, Article 1 of the Declaration of Rights provides;
All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their Lives and Liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under law shall not be denied or abridged because of sex, race, color, creed or national origin.
Mass. Const., Decl. of Rights, Art. 1 (as amended by Am. Art. 16). “Liberty” is expressly protected not only in Article 1, but also in Articles 10 and 12 of the Declaration of Rights, and is implicit in the due process protections of Pt. 2, c. I, §1, Art. 4.[16] See Mendonza v. Commonwealth, 423 Mass. 771, 778 (1996) (Articles 1 and 10 guarantee right to substantive due process).

a. Historical Application of the Term “Liberty”

The original Massachusetts Constitution of 1780 contained each of the above-referenced provisions. The Political Writings of John Adams, 498-551 (George W. Carey, ed, 2000). Social Contract Theory, the pre *596 vailing political philosophy of the late eighteenth century, had an obvious Influence on the document as drafted and ratified.[17] Social Contract Theory expounded that some rights were unalienable and could never be given up.[18]
The Preamble to the Massachusetts Constitution also makes clear that our social contract as a Commonwealth aims at the twin purposes of securing the common good insuring the conditions for individual liberty and happiness. Accordingly, the affirmative obligation of government is “to secure the existence of the body politic, to protect it, and to furnish the individuals who compose it with the power of enjoying in safety and tranquility their natural rights, and the blessings of life ...” Mass. Const., Preamble. In this context, it is not surprising that the Constitution contains guarantees of liberty, equal rights, and prohibitions on granting special privileges.
The term “liberty" appears in Articles 10 and 12 of the Declaration of Rights.[19] Under Article 10 “[e]ach individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to the standing laws . . . [N]o part of the property of any individual can, with justice, be taken from him . . . without his consent, or that of the representative body of the people.” Article 12 provides that “no subject shall be . .. deprived of his life, liberty, or estate, but by . . . the law of the land.”
Article 12 concerns the rights of criminal defendants. This supports the notion that the framers intended “liberty” to mean freedom from physical restraint. See Aime, 414 Mass. at 676; Charles E. Shattuck, The True Meaning of the Term “Liberty" in Those Clauses in the Federal and State Constitutions Which Protect “Life, Liberty, and Property," 4 Harv.L.Rev. 365, 375 (1891). See generally Cohen v. Attorney General, 357 Mass. 564, 569-70 (1970) (paying “due regard to the setting in which the [constitutional] words . . . appear”). The Magna Carta, from which Article 12 derives, attributes the same meaning to the term. Shattuck, supra, 4 Harv.L.Rev, at 376; see also Aime, 414 Mass. at 676.
Massachusetts courts have generally interpreted the due process provisions of the Massachusetts Constitution to afford no greater protection from legislative enactments than the due process provisions of the United States Constitution. Ellis, 429 Mass. at 371. Moreover, the Supreme Judicial Court has been wary of recognizing or creating new fundamental rights under the Massachusetts Constitution. Tobin's Case, 424 Mass. 250, 252-53 (1997) (no fundamental right to receive workers’ compensation benefits); Doe v. Superintendent of Sch. of Worcester, 421 Mass. 117, 130 (1995) (no fundamental right to education); Williams, 414 Mass. at 565 (no fundamental right to receive mental health services); Matter of Tocci, 413 Mass. 542, 548 n.4 (1992) (no fundamental right to practice law); Rushworth v. Registrar of Motor Vehicles, 413 Mass. 265, 269 n.5 (1992); English v. New England Medical Center, Inc., 405 Mass. 423, 429 (1989) (no fundamental right to recover tort damages); Commonwealth v. Henry’s Drywall Co., 36 Mass. 539, 542 (1974) (no fundamental right to pursue one's business); cf. Aime v. Commonwealth, 414 Mass. 667, 674 n. 10 (1993) (recognizing right to be free from physical restraint “does not involve judicial derivation of controversial ‘new’ rights from the Constitution” (internal citation omitted)). Further, historically, the Supreme Judicial Court has been more reticent than the United States Supreme Court to invalidate statutes on substantive due process grounds. Herbert P. Wilkins, Judicial Treatment of the Massachusetts Declaration of Rights in Relation to Cognate Provisions of the United States Constitution, 14 Suffolk U.L. Rev. 886, 890-91, 909-10 (Summer 1980) (in the early 1900s, the United States Supreme Court more readily overturned legislation that violated substantive due process).
fa. Opposite-sex Marriage Is Deeply Rooted in the Commonwealth's History and Tradition
Both United States and Massachusetts courts fundamental those “rights and liberties which are, objectively, ‘deeply rooted in this Nation’s history and tradition,’ and ‘implicit in the concept of ordered liberty.’ ” Glucksberg, 521 U.S. at 721. See also Griswold v. Connecticut, 381 U.S. 479, 491 (1965) (concurring opinion) (limits on substantive due process rights center on respect for teachings of history); Moore v. City of East Cleveland, 431 U.S. 494, 503-04 (noting importance of careful respect for tradition in substantive due process analysis); Michael H. v. Gerald D., 491 U.S. 110, 127 (1989) (same); Bowers v. Hardwick. 478 U.S. 186, 192 (1986) (same); Trigones v. Attorney General, 420 Mass. 859, 863 (1995) (upholding statute that does not “offend some principle of justice so rooted in tradition and conscience of our people as to be ranked fundamental"); Commonwealth v. Stowall, 389 Mass. 171, 174 (1983) (internal quotations omitted) (declining to recognize right not “implicit in the concept of ordered liberty”).
Applying these limiting principles, the Supreme Court declined to recognize a fundamental right to physician-assisted suicide, which would have required “revers[ingj centuries of legal doctrine and practice, and strik[ing] down considered policy choice of almost every State.” Glucksberg, 521 U.S. at 723. While recognizing that public attitudes toward assisted suicide are currently the subject of “earnest and profound debate,” the Court stated that the debate should remain in the political arena. Id. at 719, 735.
Similarly, Massachusetts has recognized as fundamental those rights that are deeply rooted in the Commonwealth’s history and tradition. See Curtis v. Sch. Comm. of Falmouth, 420 Mass. 749, 756 (1995) (“primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition”); Aime, 414 Mass. at 676 *597 (“right to be free from governmental detention and restraint is firmly embedded in Anglo-American law’’); Brophy v. New England Sinai Hosp., Inc., 398 Mass. 417, 430 (1986) (right to make decision to accept or reject medical treatment “has its roots deep in our history" and “has come to be widely recognized and respected"). Furthermore, Massachusetts has declined to declare fundamental rights that are not deeply rooted in history and tradition. See Three Juveniles v. Commonwealth, 390 Mass. 357, 364 (1983) (declining to find fundamental right to child-parent privilege where “(njeither Congress nor the Legislature of any State has seen fit to adopt a rule granting [such] a privilege”); Commonwealth v. Munoz, 11 Mass.App.Ct. 30, 34-35 (1980) (statute, enacted in 1859, requiring criminal defendant to produce evidence of licensure, does not “offend some principles of justice so rooted in tradition and conscience of our people as to be ranked fundamental” (internal quotation and citation omitted)).
Marriage is deeply rooted in the Commonwealth’s history and tradition. See Inhabitants of Milford, 7 Mass. 48, 1810 WL 982, *3 (Supreme Judicial Court recognized the importance of marriage to society’s peace and harmony nearly 200 years ago). The state’s history demonstrates a history of regulating marriage. Id. In fact one of the first responsibilities assigned to civil magistrates was the duty to regulate marriage. Id. Furthermore, the right to liberty guaranteed by the due process clause protects an individual’s right to marry, establish a home, and bring up children. Tarin v. Comm’r of Div. Med. Assist., 424 Mass. 743, 756 (1997). See Opinion of the Justices, 375 Mass. 795, 806 (1978) (recognizing “fundamental matters relating to marriage” as within a zone of individual privacy in which government may not intrude absent compelling interest); Secretary of the Commonwealth v. City Clerk of Lowell, 373 Mass. 178, 185 (1977) (acknowledging “freedom of choice in matters of the family”).[20]
Our sister states, faced with the same issue that we are faced with today, have declined to recognize a fundamental right to same sex-marriage.[21] See e.g., Baehr v. Lewin, 852 P.2d at 57; Baker v. Nelson, 191 N.W.2d at 186-87; Dean, 653 A.2d at 333 (plurality opinion); Storrs, 645 N.Y.S.2d at 287; Matter of Cooper, 592 N.Y.S.2d at 800. Restricting marriage to the union of one man and one woman is deeply rooted in the Commonwealth’s legal tradition and practice.[22] Our statutes’ current marriage laws derive from statutes enacted before or shortly after the adoption of our Constitution in 1780. Merriam, 375 Mass, at 253. The statutes themselves “may well be considered ... as affording some light in regard to the views and intention of [the Constitution’s] founders.” Id.
Although public attitudes toward marriage in general and same-sex marriage in particular have changed and are still evolving “the asserted contemporary concept of marriage and societal interests for which [plaintiffs) contend” are “manifestly [less] deeply founded” than the historic institution" of marriage. Cooper, 592 N.Y.S.2d at 800. No state legislature has enacted laws permitting same-sex marriages; and a large majority of states, as well as the United States Congress, have affirmatively prohibited the recognizing of same-sex marriages. See Pam Greenberg, State Laws Affecting Lesbians and Gays, Legisbrief, April/May 2001, at 1 (reporting that, as ofMay2001, 36 states had enacted “defense of marriage” statutes); 1 U.S.C. §7; 28 U.S.C. §1738C (federal defense of marriage act).[23] In Massachusetts, the Legislature recently defeated a bill that would recognize same-sex marriage. Yvonne Abraham and Rick Klein, Same-sex Marriage Ban Dealt q Setback, Boston Globe, April 25, 2002. Further, although Legislators have introduced domestic partnership legislation in successive years, none has been enacted. See S. 1208 (1999); S. 2044 (1999); H. 4947 (1999); H. 5254 (2000).
Thus, based on the history discussed above and actions of the people’s elected representatives, this court cannot conclude that “a right to same-sex marriage is so rooted in the traditions and collective conscience of our people that failure to recognize it would violate the fundamental principles of liberty and justice that lie at the base of all our civil and political institution. Neither ... is a right to same-sex marriage . . . implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it were sacrificed.” Baehr, 852 P.2d at 57. See also Baker v. Nelson, 191 N.W.2d at 186, Dean, 653 A.2d at 333 (plurality opinion); Storrs, 645 N.Y.S.2d at 287.
While this court understands the reasons for the plaintiffs’ request to reverse the Commonwealth’s centuries-old legal tradition of restricting marriage to opposite-sex couples, their request should be directed to the Legislature, not the courts. Cf. Marcoux, 375 Mass, at 71 (declining to recognize a fundamental right to private possession and use of marijuana, despite changing attitudes concerning its dangers and benefits, leaving the matter “for legislative deliberation and disposition”); Stowall, 389 Mass. at 176 (declining to recognize fundamental right to commit adultery in private, despite indications of general public disfavor with statute criminalizing adultery, and stating “appropriate means exist to address such disfavor to the Legislature”). As recognized by one state Supreme Court, “the due process clause ... is not a charter for restructuring [marriage] by judicial legislation.” Baker v. Nelson, 191 N.W.2d at 186.
3. The Right to Marry Under Article 16 of the Declaration of Rights
Plaintiffs argue that the act of marriage should be treated as “speech” for purposes of the Declaration of Rights. Article 16, analogous to the First Amendment, encompasses freedom of speech and freedom of expression. Commonwealth v. Sees, 374 Mass. 532, 535 (1978).[24] Article 16 protections extend to non-verbal *598 actions. Id. at 536-37 (nude dancing protected because non-verbal action). See also United States v. O’Brien, 391 U.S. 367, 376 (1968) (burning draft card constitutes protected speech).
Without deciding whether or not the issuance of a marriage license is speech, it would be speech by the government, not by the applicants or licensees. See Board of Regents v. Southworth, 529 U.S. 217, 229, 235 (2000). Speech by the government is immune from judicial scrutiny in the context of the First Amendment. Id. at 235. Government speech, “for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy,” not to the courts. Id. “Never . . . has the [Supreme] Court interpreted the First Amendment to require the Government itself to behave in ways that the individual believes will further his or her spiritual development or that of his or family.” Bowen v. Roy, 476 U.S. 693, 699 (1986) (plurality opinion).
Furthermore, the plaintiffs claim that their exclusion from marriage violates their right to free association under Article 16. Concord Rod & Gun Club, Inc. v. Mass. Comm’n Against Discrimination, 402 Mass. 716, 721 (1988) (noting that the constitutionally protected freedom of association encompasses both intimate and expressive associations). The Supreme Court recognizes that marriage and family are intimate relationships warranting protection. See Roberts v. United States Jaycees, 468 U.S. 609, 619 (1984); Board of Dirs. of Rotary Int’l v. Rotary Club of Duarte, 481 U.S. 537, 545 (1987). The plaintiffs bear the burden, however, to demonstrate that the present statutory scheme intrudes on those interests “to an extent which would constitute an unconstitutional interference by the State.” Curtis, 420 Mass. at 757. Moreover, the challenged state action must be “coercive or compulsory in nature.” Id. Governmental action will be deemed coercive when the action in question provides no outlet for those adversely affected but not where the affected parties have other means, even if less effective or more costly, or furthering their protected interests. Tarin, 424 Mass. at 756. Thus, forcing individuals to marry, procreate, or associate against their will would constitute a constitutional deprivation. See A.Z. v. B.Z., 431 Mass. 150, 160 (2000). Declining to give official state recognition and financial benefits to members of same-sex relationships, however, is not a constitutional deprivation. See Dean, 653 A.2d at 362 (concurring opinion) (finding marriage statute constitutional on ground, among others, that it is not a statute of exclusion, like the provision in Romer v. Evans, 517 U.S. 620 (1996), but “a statute of inclusion of opposite-sex couples who may wish to enter a particular legal status recognized by the state”). The level of intrusion effected by the lack of a marriage license is insufficiently "grievous” or “coercive” to constitute a constitutional deprivation for purposes of article 16.
In conclusion, the Massachusetts Declaration of Rights does not guarantee the fundamental right to marry a person of the same sex. Same-sex marriage is not deeply rooted in the Commonwealth’s history and tradition. By excluding the plaintiffs from marriage, the Commonwealth does not deprive the plaintiffs of their right to substantive due process, liberty, freedom of speech or freedom of association. Therefore, the court must examine whether the Legislature’s decision to limit marriage to opposite-sex couples is rationally related to a legitimate state interest.
B. Rational Review of Legislature's Decision to Limit Marriage to Opposite-sex Couples
A statute must be “rationally related to the furtherance of a legitimate State interest.” Animal Legal Def. Fund, Inc. v. Fisheries & Wildlife Bd., 416 Mass. 635, 642 (1993), quoting Dickerson v. Attorney Gen., 396 Mass. 740, 743 (1986). Under this standard, “[a] statute is presumed to be constitutional . . . and will not be invalidated where any state of facts reasonably may be conceived to justify it.” Id. at 641. The party challenging the statute bears the burden to prove “that there are no conceivable grounds supporting [the statute’s] validity . . . and every rational presumption in favor of the statute’s validity is made. St. Germaine, 416 Mass. at 703. ’’The deference to legislative judgments implicit in this standard of review does not reflect ‘an abdication of the judicial role,’ but rather a ‘recognition of the . . . undesirability of the judiciary substituting its notions of correct policy for that of a popularly elected Legislature.’ “ Blue Hills Cemetery, Inc. v. Bd. of Registration in Embalming & Funeral Directing, 379 Mass. 368, 372 (1979) (quoting Zayre Corp. v. Attorney Gen., 372 Mass. 423, 433 (1977)).
First, the statutory classification challenged by the plaintiffs is between same-sex and opposite-sex couples. See Baker v. Vermont, 744 A.2d at 880 (the Vermont Supreme Court, faced with the same issue, also noted that the statutory classification is between same-sex and opposite-sex couples). Next, neither party contests the Commonwealth’s power to regulate marriage, including the power to set qualifications for who may marry. Stowell, 389 Mass. at 174. Further, the state’s interest in regulating marriage is based on the traditional concept that marriage’s primary purpose is procreation.[25] Milford, 7 Mass. at 51. See Adams, 486 F.Sup. at 1124 (“state has a compelling interest in encouraging and fostering procreation of the race”); Singer, 522 P.2d at 1195 (“[M]arriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race”); Dean, 653 A.2d at 337 (finding that this “central purpose . . . provides the kind of rational basis . . . permitting limitation of marriage to heterosexual couples”).
Recognizing that procreation is marriage’s central purpose, it is rational for the Legislature to limit marriage to opposite-sex couples who, theoretically, are capable of procreation.[26] See, e.g., H.R. Rep. 104- *599 664 (1996), at 14 (House Judiciary Comm. Report recommending passage of federal defense of marriage act); Sunstein, supra, 70 Ind.L.J. at 6 (“It is at least rational... to say that marriage is reserved for cases in which children can potentially result from the married couple”). Moreover, because same-sex couples are unable to procreate on their own and therefore must rely on inherently more cumbersome means of having children, it is also rational to assume that same-sex couples are less likely to have children or, at least, to have as many children as opposite-sex couples.
This court acknowledges the inherent contradiction that the Commonwealth allows same-sex couples to establish legal relationships with their children but not with each other. Adoption of Tammy, 416 Mass. 205 (1993); Adoption of Susan, 416 Mass. 1003 (1993); E.N.O. v. 429 Mass. 824, cert. denied, 528 U.S. 1005 (1999). Furthermore, the Legislature amended the adoption laws to allow adoption of children by same-sex couples. See Acts & Resolves 1999, c. 3, §15. The Commonwealth’s elected representatives, not the courts, should resolve this paradox. See Connors, 430 Mass. at 43 (excluding the word “spouse” to exclude domestic partners). While this court understands the plaintiffs’ efforts to be married, they should pursue their quest on Beacon Hill.

ORDER

For the foregoing reasons, it is therefore ORDERED that plaintiffs’ motion for summary judgment be DENIED and defendants’ cross-motion for summary judgment is ALLOWED.

 The parties further agree on three fundamental points. First, there is no dispute that plaintiffs have both the statutory and constitutional right to be free from invidious discrimination on the basis of their sexual orientation. Second, the parties do not dispute that marriage is a vitally important institution. Finally, to date, no appellate court or legislature has recognized or created a legal right to same-sex marriage.

 Additionally, many state attorney generals have also considered this issue and concluded that “marriage” applies only to opposite-sex couples. See 190 Op. A.G. of Ala. 30 (1983); Op. A.G. of Ark. (Apr. 26, 1995); 1975 Op. A.G. of Colo. (Apr. 24, 1975); 1993 Op. A.G. of Idaho 199 (1993); 77 Op. A.G. of Kan. (Aug. 4, 1977); Op. A.G. of La. (Dec. 23, 1992); Op. A.G. of Me. (Oct. 30, 1984); Op. A.G. of Miss. (July 10, 1978); 1976 Op. A.G. of S.C. (Aug. 12, 1976); 88 Op. A.G. of Tenn. 43 (1988); Op. A.G. of Va. 154 (1977).

 It is important to note that the Legislature, when amending the state anti-discrimination statute to prohibit discrimination on the basis of sexual orientation, stated “(njothing in this act shall be construed to legitimize or validate a ‘homosexual marriage,’ so-called, or to provide health insurance or related employee benefits to a ‘homosexual spouse,” so-called." St. 1989, c. 516, §19.

 Plaintiffs also assert that the state’s marriage regulations violate their rights to equal protection under the Massachusetts Declaration of Rights. This argument fails because Massachusetts’ Equal Rights Amendment (“ERA”) does not apply to discrimination based on sexual orientation. See Macauley v. MCAD, 379 Mass. 279, 282 (1979) (declining to interpret anti-discrimination statute to apply to sexual orientation discrimination). See also Attorney Gen. v. Desilets, 418 Mass. 316, 327 (1994) (ERA does not apply to classifications based on marital status); Harding v. DeAngelis, 39 Mass.App.Ct. 455, 458 n.3 (1995) (same); Powers v. Wilkinson, 399 Mass. 650, 657 n. 11 (1987) (ERA does not apply to classifications based on illegitimacy, only to those based on sex, race, color, creed, or. national origin).

 Article 1 states: “All people are born free and equal and have certain natural, essential and unalienable rights: among which may be reckoned the right of enjoying and defending their Lives and Liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under law shall not be denied or abridged because of sex, race, color, creed or national origin.” Mass. Const., Pt. 1, Art. 1.

 Article 10 provides in part: “Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws . . .” Mass. Const., Pt. 1, Art. 10.

 Article 12 states: “And no subject shall be arrested, imprisoned, despoiled or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers or the law of the land.” Mass. Const., Pt. 1, Art. 12.

 Mass. Const., Pt. 2, ch. 1 §1, Art. 4 provides that the General Court has power “to make, ordain, and establish, all manner of wholesome and reasonable Orders, laws, statues and ordinances ... so as the same be not repugnant to or contrary to this Constitution, as they shall judge to be for the good and welfare of this Commonwealth, and for the government and ordering thereof, and of the subjects of same . . .” Id.

 Article 6 states: “No man, nor corporation or association of men, have any other title to obtain advantages, or particular and exclusive privileges, distinct from those of the community, than what arises from the consideration of services rendered to the public; and this title being in nature neither hereditary, nor transmissible to children or descendants, or relations by blood, the idea of a man born a magistrate, lawgiver, or judge is absurd and unnatural.”

 In the federal constitution, this principle is embodied in Article I, §9, which expressly denies Congress the power to grant titles of nobility. The First Congress interpreted this federal provision (particularly Massachusetts Congressman Elbridge Gerry), to decide not to confer an official title — other than simply “The President" — or the chief executive. Kent Greenfield, Original Penumbras: Constitutional Interpretation of the First Year of Congress, 26 Conn.L.Rev. 79, 121 & n.254 (fall 1993).

 Article 7 states: “Government is instituted for the common good; for the protection, safety, prosperity, and happiness of the people; and not for the profit honor, or private interest of any one man, family, or class of men: Therefore, the people alone have an incontestable, unalienable, and indefeasible right to institute government; and to reform, alter or totally change the same, when their protection, safety, prosperity, and happiness require it.”

 “[I]t is the Right of the People to alter or to abolish [the Form of Government,] and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness.” Declaration of Independence, second paragraph.

 The framers' intent that the Legislature should be the arbiter of the public good is further evidence by Pt. 2, c. 1, § 1, art. 4, which confers on the Legislature “full power and authority ... to make ... all manner of wholesome and reasonable . . . laws ... as they shall judge to be for the good and welfare of the commonwealth . . . and of the subjects of the same."

 Article 10 provides in part: “Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws . . ." Mass. Const., Pt. 1 Art. 10.
Article 12 states: “And no subject shall be arrested, imprisoned, despoiled or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peer or the law of the land.” Mass. Const., Pt. 1, Art. 12. The Supreme Judicial Court has also noted the term “law of the land” was taken from the Magna Carta and embraces all that is comprehended in the words “due process of law” in the Fourteenth Amendment of the United States Constitution. Commonwealth v. O'Neal, 367 Mass. 440, 448 n.5 (1975).
Mass. Const., Pt. 2, ch. 1, §1, Art. 4 provides in part that the General Court has power “to make, ordain, and establish, all manner of wholesome and reasonable Orders, laws, statutes and ordinances ... so as the same be not repugnant to or contrary to this Constitution, as they shall judge to be for the good and welfare of this Commonwealth, and for the government and ordering thereof, and of the subjects of the same . . .”

 John Adams authored the Massachusetts Constitution. Adams, supra, 92. Adams worked both with his own vast knowledge and with his experience as a patriot chafing under British rule that denied the rights of Englishmen to American colonists solely because of their status as colonists — a violation of the social contracts. Robert F. Williams, The Emergence of State Constitutional Law, 63 Tex.L.Rev. 1195, 1198 (1985); Bernard Bailyn, The Ideological Origins of the American Revolution, 94-143 (1967); Gordon Wood, The Creation of the American Republic, 1776-1787, at 3-45 (1969, 1998 ed).
These concerns animated a then unique conception of constitutional rights as those natural rights secured by a constitution rather than the common law alone. Bailyn, The Ideological Origins, at 175-198. Among those natural rights was “liberty" and Adams and others understood that only a system of checks and balances could ensure liberty against an otherwise powerful government. Id. At 55-59, 68, 79; Gordon Wood, Foreword: State Constitution-Making in the American Revolution, 24 Rutgers L.J. 911, 914 (1993).
While drafting the 1780 Constitution, Adams also knew of the failed ratification of the draft constitution of 1778, a vote that at least in part was based on the absence of a Bill of Rights in the draft constitution. Edward W. Hennessey, The Extraordinary Massachusetts Constitution of 1780, 14 Suffolk U.L. Rev. 873, 880 (1980) (describing history); Essex Result, supra, at 332 n.6 (describing supremacy of bill of rights).

 In contrast, alienable rights could be parted with in exchange for an equivalent protection and that each individual surrenders those rights “only when the good of the whole requires it." Essex Result, supra, at 330-31 n.6 (emphasis in original).

 The term “liberties” also appears in Article 1 of the Declaration of Rights, which is primarily concerned with equality rather than due process. In that context, the Supreme Judicial Court has construed the term to “mean a liberty regulated by law.” Commonwealth v. Libbey, 216 Mass. 356, 357 (1914).

 Additional marriage-related laws include repealing the ban on interracial marriage, restrictions on remarrying after divorce and restrictions on competency. See Michael Grossberg, Governing the Hearth: Law and Family in Nineteenth Century America, 127 (1985); St. 1965, c. 640 (repealing all disabilities upon remarriage after divorce); St. 1986, c. 599 §52 (repealing section of law relating to validity of marriages contracted by “msane persons, idiots, or feeble-minded persons”).

 The one exception was the Alaska Superior Court, which relied on that state’s constitution's express privacy.

 By contrast, statutory restrictions on interracial marriage, such as that struck down in Loving v. Virginia, 388 U.S. 1 (1967), or on abortion, such as that struck down in Roe v. Wade, 410 U.S. 113 (1973), did not have such deep historical roots. See Grossbend, supra, at 126-27 ("Unlike most of the restrictions on marriage, the racial prohibition was an American innovation without English precedent”); Loving, 388 U.S. at 6 (Virginia's anti-miscegenation law was not enacted until 1924); Roe, 410 U.S. at 129 (“restrictive criminal abortion laws . . . are of relatively recent vintage ...[,] not of ancient or even common-law origin”).

 In the 2000 presidential election campaign, all Democratic and Republican candidates for president and vice-president opposed the legalization of same-sex marriage. David Orgon Coolidy & William C. Duncan, Reaffirming Marriage: A Presidential Priority, 24 Harv. J.L. & Pub. Pol’y 623, 624-26 (spring 2001).

 Federal law guides free speech analysis because the Supreme Judicial Court has not established the precise contours of the freedom of expression under the State Constitution. Cf. Cob v. Treasurer & Receiver Gen.. 378 Mass. 550, 558 (1979) (federal law guides state freedom of speech analysis); Hosford v. Sch. Comm. of Sandwich, 421 Mass. 708, 712 (1996) (same). See also Opinion of the Justices, 375 Mass. at 808 (“If a right to privacy is implied in the 'right of free speech’ preserved in art. 16 of the Massachusetts Declaration of Rights, it is no greater than the right to privacy the Supreme Court of the United States has recognized under the First Amendment to the United States Constitution”). But see Wilkins, supra, 14 Suffolk U.L.Rev. at 928 (‘The Supreme Court of the United States has traditionally taken a more expansive view of freedom of speech than has the Massachusetts court”).

 This court recognizes that societal attitudes and norms are constantly evolving. Today, many married couples choose not to or cannot bear children. Likewise, many same-sex couples do have children. In fact, four of the seven plaintiff couples have children. While this is a strong argument for legalizing same-sex marriage, the plaintiffs should raise this issue before the Legislature. For purposes of rational basis review, however, courts apply a deferential standard, allowing for under inclusiveness and over inclüsiveness. See Murphy, 429 Mass. at 741. Other courts have recognized that the alternative “would be to inquire of each couple, before issuing a marriage license, as to their plans for children and to give sterility tests to all applicants . . . Such tests and inquiries would themselves raise serious constitutional questions.” Adams, F.Sup. at 1124, citing Griswold, 381 U.S. at 1124-25. See also Dean, 653 A.2d at 363-64 n.5; Baker v. Nelson, 191 N.W.2d at 187; Cooper, 592 N.Y.S.2d at 800 (all rejecting over and under inclusiveness argument regarding ability to procreate).

 Advances in medicine have allowed both heterosexual and homosexual couples to conceive by “non-traditional” means. In fact, with the aid of reproductive technologies, lesbian couples may conceive children with a biological or genetic relationship to both parents. Culliton v. Beth Israel Deaconess Med. Ctr., 435 Mass. 285 (2001) (egg-donor insemination results in two women having either biological or genetic relationship to child). The majority of couples bearing children, however, still conceive through natural means.